# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **XCALIBER INTERNATIONAL LIMITED, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO: 04-0069** |
| **JAMES D. "BUDDY" CALDWELL, ET AL** | **SECTION: "S"** |

## ORDER AND REASONS

The Motion for Summary Judgment (Doc.#162) filed by defendant James D. "Buddy" Caldwell, in his official capacity as the Attorney General, State of Louisiana is **GRANTED,** and the Motion for Summary Judgment (Doc. #168) by plaintiff Xcaliber International Limited, LLC is **DENIED**.

## BACKGROUND

In the mid-1990s, the State of Louisiana and other states filed suit against the major tobacco manufacturers to recoup the cost of medical services that they had provided to smokers. In 1998, these states and manufacturers executed a Master Settlement Agreement. Each state agreed to release their claims in exchange for annual payments by each participating manufacturer which payment would be shared among the settling states based upon a fixed formula.[1] Under the Master Settlement Agreement, participating manufacturers were prohibited from lobbying, were limited to certain kinds of advertising, were restricted on trade association activities, and were required to

---

[1]Under that formula, Louisiana would receive approximately 2.26%.

relinquish legal challenges to state laws regulating tobacco.

The Master Settlement Agreement also provided an incentive to other manufacturers who had not signed onto the Master Settlement Agreement to participate by providing a ninety-day period within which they could join the Master Settlement Agreement. Under the Master Settlement Agreement, manufacturers joining within the ninety-day period were exempt from making any annual payments, so long as their market share did not exceed their 1997 or 1998 levels by a specified amount. After the ninety-day period, other manufacturers were allowed to join the Master Settlement Agreement, but were not exempt from any portion of the annual payment. The manufacturers joining after the original execution of the Master Settlement Agreement are known as subsequent participating manufacturers; and collectively, all manufacturers signing the Master Settlement Agreement are known as participating manufacturers.[2]

To neutralize any cost disadvantage that the participating manufacturers would have in comparison to non-participating manufacturers, the Master Settlement Agreement required that each settling state enact model legislation, which in Louisiana is codified in Louisiana Revised Statutes 13:5061 *et seq*. Under these statutes, each manufacturer selling cigarettes in Louisiana was required to sign the Master Settlement Agreement or to deposit a specified sum per cigarette sold in Louisiana into an escrow account. The amount held in escrow would be released to the State in payment of any judgment obtained against the non-participating manufacturer in a suit brought by the State or in settlement of a claim by the State against the non-participating manufacturer, or

---

[2]Plaintiff does not challenge the Master Settlement Agreement or the fact the Master Settlement Agreement allows for exempt and non-exempt subsequent participating manufacturers.

would be returned to the non-participating manufacturer if twenty-five years passed without such a judgment or settlement. Included in the model legislation was the following provision:

> To the extent that a [non-participating manufacturer] establishes that the amount it was required to place into escrow in a particular year was greater than the state's allocable share of the total payments that such manufacturer would have been required to make in that year under the [Master Settlement Agreement] ... had it been a [participating manufacturer], the excess shall be released from escrow and revert back to such [non-participating manufacturer].

This provision may have created an unintended loophole whereby a non-participating manufacturer could concentrate its sales in only one or a few states and then could recoup its escrow payment for all but those states' allocable percentages under the Master Settlement Agreement. For example, a non-participating manufacturer selling 100% of its cigarettes in Louisiana would be able to obtain a release of all but 2.26% (Louisiana's share under the Master Settlement Agreement) of its escrow payment to Louisiana, and would not have escrow obligations to other states. However, a participating manufacturer, regardless of the number of states in which it sold its products, would have to pay the full amount of its obligation under the Master Settlement Agreement, to be distributed among the various states.

To remedy the unintended competitive advantage to the non-participating manufacturers who concentrated their sales in one or a few states, the settling states, including Louisiana, amended the provision. The "allocable share amendment" provides:

> To the extent that a tobacco product manufacturer establishes that the amount it was required to place into escrow on account of units sold in the state in a particular year was greater than the Master Settlement Agreement payments ... that such manufacturer would have been required to make on account of such units sold had it been a

participating manufacturer, the excess shall be released from escrow
and revert back to such tobacco product manufacturer.[3]

**Procedural History**

In this action, plaintiff, a non-participating manufacturer, attacks the allocable share amendment. Plaintiff contends that before the amendment, the non-participating manufacturers would have been entitled to a refund of those amounts deposited in escrow in excess of the hypothetical amount the state could have received in Master Settlement Agreement payments had the non-participating manufacturer been a participating manufacturer. Plaintiff contends that with the passage of the allocable share amendment, non-participating manufacturers are no longer entitled to early refund of the excess escrow deposits. Plaintiff further argues that this amendment significantly raises the costs of the non-participating manufacturers, while participating manufacturers are not so impacted.

Defendant contends that although the allocable share amendment changed the formula under which plaintiff was previously entitled to obtain an early release of funds from escrow, the amendment provides that the deposit cannot exceed the payment plaintiff would owe in settlement proceeds on its Louisiana sales if it were a Master Settlement Agreement participant. Further, under the amendment, non-participating manufacturers, unlike participating manufacturers, retain ownership of the funds deposited into escrow and are entitled to a release of the unused escrowed amounts twenty five-years after they are deposited.

On March 25, 2006, the Fifth Circuit vacated this court's previous order, which granted the

---

[3]La. Rev. Stat. §13:5063C(2)(b).

defendant's 12(b)(6) Motion to Dismiss. The case was remanded to this court for further proceedings (Doc. #42). The parties are now before the court on cross motions for summary judgment.

Plaintiff, a non-participating manufacturer, now seeks summary judgment, contending that the allocable share amendment implements, as a matter of law, an anticompetitive scheme which is preempted by the Sherman Act. Plaintiff also contends that the amendment violates the Equal Protection Clause of the United States Constitution and similar provisions of the Louisiana Constitution because the amendment impermissibly interferes with plaintiff's First Amendment rights and that, as a result, the amendment cannot survive strict scrutiny under an equal protection analysis. Additionally, plaintiff argues that the Equal Protection Clause is offended because the State had no rational basis to enact the amendment. Plaintiff argues that the amendment results in a prejudgment deprivation of property in violation of plaintiff's procedural due process rights.[4]

In its motion for summary judgment, defendant seeks dismissal of plaintiff's Sherman Act claims and claims of violations of the United States Constitution and the Louisiana Constitution. Defendant argues that any anticompetitive effect of the allocable share amendment does not constitute a violation of the Sherman Act, and that plaintiff has no evidence that the amendment authorizes or mandates private action that is *per se* violative of the Sherman Act. Defendant also argues that plaintiff's First Amendment claim is unfounded because plaintiff has no evidence that the amendment coerced plaintiff to relinquish its First Amendment rights of free speech and association. Defendant further contends that plaintiff's equal protection claims also fail because the

---

[4]Plaintiff has abandoned its commerce clause allegations.

State had a rational basis for enacting the amendment, and that the State thus acted within the boundaries of the United States Constitution. Defendant also contends that the State has not waived its immunity under the Eleventh Amendment and therefore plaintiff's State Constitutional claims fail.

## ANALYSIS

### 1. Legal Standard

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law."[5] If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial.[6]

### 2. Sherman Act Claim: Count IV, Supplemental Complaint

Plaintiff relies on two theories under the Sherman Act: that the allocable share amendment constitutes a *per se* violation of the Sherman Act, and that the amendment creates "hybrid restraint" on competition such that the amendment is preempted by the Sherman Act. Defendant denies both theories.

The Sherman Act prohibits anticompetitive conduct by private firms, and provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person

---

[5]*Amburgey v. Corhart Refractories Corp.*, 936 F.2d 805, 809 (5th Cir. 1991); Fed. R. Civ. Proc. 56(c).

[6]*Celeotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.[7]

Private parties are precluded under the Sherman Act from fixing minimum prices, or engaging in other types of price fixing.[8] "Under the Sherman Act, a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate and foreign commerce is illegal *per se*."[9]

While the Sherman Act restricts private entities, the Supreme Court has noted that the Sherman Act was not "intended to restrain state action or official action directed by a state."[10] "[W]here the action complained of was that of the State itself, the action is exempt from antitrust liability regardless of the State's motives in taking the action."[11] "[A] state statute is not invalid under the Sherman Act merely because the statute will have an anticompetitive effect. Otherwise, if an adverse effect upon competition were enough to render a statute invalid under the Sherman Act,

---

[7]15 U.S.C. §1.

[8]*Schwegmann Bros v. Calvert Distillers Corp.*, 341 U.S. 384, 386 (1951).

[9]*U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940). *See also Fisher v. City of Berkeley, Cali.,* 475 U.S. 260, 275 n. 1 (1986)(noting that price fixing has been traditionally held to be *per se* illegal under the Sherman Act)

[10]*Parker v. Brown,* 317 U.S. 341, 351 (1943).

[11]*City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 377-78 (1991)(*citing Hoover v. Ronwin*, 466 U.S. 558, 579-80 (1984)). "[A] state is free to regulate, or act on its own behalf, in ways that are anti-competitive and would not be permitted to a private individual. This doctrine is so well settled that its rationale and underpinnings are scarcely worth discussing." *Neo Gen Screening, Inc., v. New England Newborn Screening Program*, 187 F.3d 24, 28 (1st Cir. 1999), *cert. denied*, 528 U.S. 1061 (1999).

the States' power to engage in economic regulation would be effectively destroyed."[12]  "[T]he function of government may often be to tamper with free markets, correcting their failures and aiding their victims."[13]

The Sherman Act will preempt a state statute only where there is an "irreconcilable conflict between the federal and state regulatory schemes."[14]  The existence of a hypothetical or potential conflict is insufficient to warrant the preemption of the state statute.[15]  "[A] state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful."[16]

Plaintiff bears the burden of showing that a state statute which restrains competition is preempted by the Sherman Act.  To do so, plaintiff must demonstrate that the legislation at issue "**mandates** or **authorizes** conduct that necessarily constitutes a violation of the antitrust laws in all cases, or [that] it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute."[17]

"A hybrid restraint is [another] form of state law that is *per se* illegal under the Sherman

---

[12]*Community Communications Co., Inc. v. City of Boulder*, 455 U.S. 40, 64 (1982) (*citing New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 439 U.S. 96, 111 (1978)(quotations omitted)).

[13]*Fisher,* 475 U.S. at 264.

[14]*Rice v. Norman Williams, Co.*, 458 U.S. 654, 659 (1982).

[15]*Rice,* 458 U.S. at 659.

[16]*Parker*, 317 U.S. at 351.

[17]*Fisher,* 475 U.S. at 265 (*quoting Rice*, 458 U.S. at 661)(emphasis added).

Act."[18]  A regulatory scheme may be attacked as a"hybrid restraint"[19] under §1 of the Sherman Act where "private actors are ... granted 'a degree of private regulatory power.'"[20]  "[I]t exists when the state passes laws that enforce companies' decisions to collude on prices, to dictate prices by which other companies must abide, or to otherwise violate the Sherman Act."[21]

In *Parker v. Brown*, the Court held that the Sherman Act does not apply "to the anticompetitive conduct of a State acting through its legislature."[22]  At the same time, "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful..."[23]  "Our decisions have established a two-part test for determining immunity under *Parker v. Brown*.  First, the challenged restraint must be one clearly articulated and affirmatively expressed as state policy; second, the policy must be actively

---

[18]*Sanders v. Brown*, 504 F.3d 903, 918 (9th Cir. 2007), *cert. denied*, 128 S.Ct. 2427 (2008).  *See also KT&G Corp. v. Att'y Gen'l of Oklahoma,*535 F.3d 1114, 1130 (5th Cir. 2008).

[19]"Certain restraints may be characterized as 'hybrid,' in that nonmarket mechanisms merely enforce private marketing decisions."  *Fisher*, 475 U.S. at 267-68.

[20]*324 Liquor Corp. v. Duffy,* 479 U.S. 335, 345 n. 8 (1987)(*citing Fisher,* 475 U.S. at 268 and *quoting Rice,* 458 U.S. at 666 n.1.

[21]*Sanders,* 504 F.3d at 918.  *See also KT&G Corp.,* 535 F.3d at 1130.

[22]*Town of Hallie v. Eau Claire*, 471 U.S. 34, 38 (1985)(*citing Parker*, 317 U.S. 341 (1943)).

[23]*Parker*, 317 U.S. at 351.  The Supreme Court noted:

> In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.
>
> The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state.

*Parker*, 317 U.S. at 351.

supervised by the State itself."[24]  However, if a court determines that a plaintiff is unable to show

a violation under the Sherman Act, it is not necessary for a court to consider whether the state statute

can be saved from invalidation under the *Parker* state action doctrine.[25]

## A.  Per Se Violation of the Sherman Act

Although plaintiff is not challenging the Master Settlement Agreement, it contends that the

combination of the Master Settlement Agreement and the allocable share amendment creates

restraints which are *per se* violations of the Sherman Act because they  allow "participating

manufacturers to collusively restrict output and raise prices to supracompetitive levels (far beyond

the price increases necessary to cover their Master Settlement Agreement payments)" to drive the

non-participating manufacturers  out of business.  Plaintiff contends that its exhibits provide

evidence that the allocable share amendment has an anticompetitive effect, particularly with regard

to the exempt  subsequent participating manufacturers which plaintiff considers its main

competitors; therefore, the allocable share amendment is violative of the Sherman Act.

Plaintiff presents the report of its expert, Professor Jeremy Bulow, to support its argument

that the amendment has an anticompetitive effect.  Professor Bulow opined that the allocable share

amendment resulted in an immediate 92% decline in the market share of non-participating

manufacturers; that non-participating manufacturers pay disproportionately more escrow payments;

that six of fifteen exempt  subsequent participating manufacturers  did not sell enough cigarettes to

---

[24]*324 Liquor Corp.,* 479 U.S. at 345 (citations omitted).

[25]*See Rice*, 458 U.S. at 662 n.9 ("Because of our resolution of the preemption issue, it is not necessary for us to consider whether the statute may be saved from invalidation under the doctrine of *Parker v. Brown* ...").

incur any Master Settlement Agreement costs; and that because the Master Settlement Agreement releases the participating manufacturers from liability, non-participating manufacturers without such a release are finding that because of fear of liability, distributors and retailers are unwilling to carry their products. Plaintiff also points to a statement of William Sorrel, the Attorney General of Vermont, which references "the urgency of all States [to take] steps to deal with the proliferation of non-participating manufacturer sales, including the enactment of complimentary legislation and allocable share legislation."

The defendant argues that plaintiff has no evidence that the Master Settlement Agreement itself penalizes manufacturers for increasing their market share to such a degree that those manufacturers will refrain from unilaterally making their own pricing and production decisions. The defendant's expert, Professor Jonathan Gruber, opined that whether there is or is not an escrow, participating manufacturers and non-participating manufacturers have the same incentive to sell as many cigarettes as possible; and that the formula used does not authorize or require either the participating manufacturers or the non-participating manufacturers to fix prices or output, or otherwise to engage in cartel-like behavior. Further, defendant argues that smoking in general has declined 25% compared to pre-Master Settlement Agreement levels, and that the decline in tobacco sales reflects a decline in tobacco use, rather than cartel-like behavior.

On a motion for summary judgment, the movant bears the burden of proving that no question of material fact precludes summary judgment. Specifically, plaintiff must show that the allocable share amendment mandates or authorizes conduct that constitutes a violation of the antitrust laws in all cases, or that the allocable share amendment places irresistable pressure on a private party to

violate the antitrust laws to comply with the statute.

Plaintiff's evidence of an anticompetitive effect of the allocable share amendment is insufficient to establish that the amendment creates a scheme that constitutes a *per se* violation the Sherman Act. States are free to adopt legislation that may have an anticompetitive effect so long as there is no "irreconcilable conflict between the federal and state regulatory schemes."[26] The escrow required of the non-participating manufacturer under the amendment is based on a neutral calculation. As the Tenth Circuit has noted in a parallel Oklahoma case brought by the same plaintiff:

> [The allocable share amendment] only requires non-participating manufacturers to make an annual escrow payment, based upon the number of cigarettes that the non-participating manufacturer sells in the state in a given year multiplied by a per-cigarette amount established by the state legislature. The fact that the amount of that escrow payment is capped by referencing the amount that the non-participating manufacturer would have been paid under the Master Settlement Agreement on that same volume of sales does not change the fact that the statute, on its face, does not mandate or authorize conduct that is a *per se* violation of the Sherman Act in all cases.[27]

The allocable share amendment requires the non-participating manufacturer to pay into escrow an amount that is based on the number of cigarettes sold in Louisiana. Nothing in the language of the amendment authorizes or mandates conduct that is a violation *per se* of the Sherman Act.[28] Further,

---

[26]*Rice,* 458 U.S. at 659.

[27]*KT&G Corp.,* 535 F.3d at 1130.

[28]The allocable share amendment does not remove from tobacco manufacturers the ability to unilaterally set their own prices for their products.

12

on its face, the amendment does not "'place ... irresistable pressure on a private party to violate the antitrust laws in order to comply with the statute,'"[29] a point conceded by plaintiff in other litigation.[30]

Plaintiff has not provided the court with evidence that the allocable share amendment mandates or authorizes conduct that constitutes a violation of the antitrust laws in all cases, or that the allocable share amendment places irresistable pressure on a private party to violate the antitrust laws to comply with the statute. Plaintiff has not provided evidence of a *per se* violation of the Sherman Act, a conclusion reached by numerous other courts regarding other states' allocable share amendments.[31]

## B. Hybrid Restraint

Plaintiff contends that the allocable share amendment constitutes hybrid restraint that violates the Sherman Act. A regulatory scheme may be violative of §1 of the Sherman Act as a "hybrid restraint" "[w]here private actors are . . . granted a degree of private regulatory power." Private parties are precluded under the Sherman Act from fixing minium prices, or engaging in other types of price fixing. A hybrid restraint is another form of state law that is *per se* illegal under the Sherman Act.

---

[29]*Fisher*, 475 U.S. at 265 (*quoting Rice*, 458 U.S. at 661).

[30]*See KT&G*, 535 F.3d at 1129.

[31]*See Trident Int'l Corp. v. Kentucky*, 467 F.3d 547, 555-58 (6th Cir. 2006); *Int'l Tobaccos Partners, Ltd. v. Kline*, 475 F. Supp. 2d 1078, 1080, 1086-87 (D. Kan. 2007); *Int'l Tobacco Partners Ltd. v. Beebe*, 418 F.Supp.2d 989, 994-97 (W.D. Ark. 2006); *Grand River Enters. Six Nations, v. Beebe*, 418 F.Supp.2d 1082, 1089-91 (W.D. Ark. 2006); *Dos Santos v. Beebe*, 418 F.Supp. 2d 1064, 1071-73 (W.D. Ark. 2006); *S&M Brands, Inc. v. Summers*, 393 F.Supp.2d 604, 629 (M.D. Tenn. 2005)*, aff'd,* 228 Fed. Appx. 560 (6th Cir. 2007). *See also Grand River Enters. Six Nations, Ltd. v. Pryor*, 2006 WL 1517603, at * 8-9 (S.D.N.Y. May 31, 2006), *aff'd* 481 F.2d 60 (2d Cir. 2007).

The Supreme Court has recognized that a state statute can constitute a hybrid restraint which violates the Sherman Act.[32] In *Schwegmann Brothers*, the Court considered a price-fixing scheme between interstate distributors of liquors by which retailers signed price-fixing contracts promising not to sell at less than the prices stated in the distributors' schedules. The Louisiana statute at issue permitted a contract for the sale or resale of a commodity to require that the buyer would not resell "except at the price stipulated by the vendor." It also permitted the distributor and retailer to enter into a contract fixing the resale price and condemned as "unfair competition" a sale at less than the price stipulated, even though a seller was not a party to the contract. The Court noted that "when a state compels retailers to follow a parallel price policy, it demands private conduct which the Sherman Act forbids."[33] Further, the Court noted that under the Louisiana statute, both the selection of minimum price levels and the exclusive power to enforce those levels were left to the discretion of the distributors. "While the petitioner-retailer ... may have been required to adhere to the levels so selected, the involvement of his suppliers in setting those prices made it impossible to characterize the regulation as unilateral action by the State of Louisiana."[34] The Court held that notwithstanding the state statute, the two liquor distributors had violated the Sherman Act when they attempted to hold a retailer to the price-fixing terms of a contract that it had refused to sign.[35]

---

[32] *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 71 S.Ct. 745(1951); *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 97, 100 S.Ct. 937 (1980); *324 Liquor Corp. v. Duffy,* 479 U.S. 335, 107 S.Ct. 720(1987). *See also Fisher v. City of Berkeley, Cal.*, 475 U.S. 260, 106 S.Ct. 1045(1986).

[33] *Schwegmann Bros.,* 341 U.S. at 389.

[34] *Fisher*, 475 U.S. at 268 (discussing *Schwegmann*).

[35] *Fisher,* 475 U.S. at 268 (discussing *Schwegmann*).

The *Midcal* case presented a similar price-fixing scheme. The California law at issue required wine producers, or wholesalers in their stead, to set retail prices for the producer's product.[36] The state had no control over the prices set by the wine producers, but the state enforced the prices set by the wine producers. The Supreme Court noted that the "legislative policy is forthrightly stated and clear in its purpose to permit resale price maintenance."[37] The Supreme Court ruled that the wine pricing scheme restrained trade in violation of the Sherman Act, and ordered the California Department of Alcoholic Beverage Control not to enforce resale price maintenance and price posting statutes for the wine trade.[38]

In *324 Liquor*, the New York statute at issue required private parties, liquor wholesalers, to set the prices retailers would pay for the liquor they purchased, and further provided for the State's enforcement of those prices.[39] A retail liquor and wine dealer brought an action seeking review of a determination of the New York Liquor Authority (which held the dealer in violation of the Alcoholic Beverage Control Law) and challenging the validity of the statutory scheme governing liquor prices. The court held that the statute did not fall within the state action exemption from antitrust laws.[40]

*Schwegmann, Midcal* and *324 Liquor* are distinguishable from the case at hand. In all three

---

[36]*Midcal*, 445 U.S. at 97.

[37]*Midcal,* 445 U.S. at 105.

[38]*Midcal*, 445 U.S. at 97.

[39]*324 Liquor*, 479 U.S. at 337-40.

[40]*324 Liquor*, 479 U.S. at 337-40.

15

cases, the state statute at issue explicitly provided for price maintenance and allowed private parties to set pricing, an activity which was held to violate the Sherman Act.

The allocable share amendment does not mention price fixing or maintenance. Rather, it sets an amount to be deposited into escrow based on the number of cigarettes sold by the non-participating manufacturer in the State of Louisiana. Plaintiff has provided no evidence that the state is condoning or enforcing a price fixing or maintenance scheme by private parties or that prices, in fact, have been fixed. Professor Gruber opined that original participating manufacturers, subsequent participating manufacturers and non-participating manufacturers are free to set prices unilaterally. Further, plaintiffs have provided no evidence that the Master Settlement Agreement enables private actors to manipulate the amount of escrow payments a non-participating manufacturer must make, or that the participating manufacturers have been wielding regulatory power granted them by the allocable share amendment.

In this case, Louisiana's allocable share amendment requires non-participating manufacturers to make annual escrow payments which are calculated by multiplying the number of cigarettes the non-participating manufacturer sells in Louisiana by a legislatively-created amount. The fact that the payments are capped by reference to the Master Settlement Agreement does not amount to delegating regulatory authority to private parties.[41]

The evidence presented by plaintiff does not support a conclusion that the allocable share

---

[41]Similar conclusions were reached by other courts for other states' allocable share amendments. *See e.g., KT&G Corp.*, 535 F.3d at 1132; *Int'l Tobacco Partners, Ltd.*, 420 F.Supp.2d at 994-97; *Grand River Enters. Six Nations, Ltd.*, 418 F.Supp.2d at 1089-91; *Dos Santos*, 418 F.Supp. 2d at 1072-73 (W.D. Ark. 2006); *S&M Brands*, 393 F. Supp. 2d at 630; *Grand River Enters. Six Nations*, 2006 WL 1517603 at *9.

amendment either provides for price maintenance or has allowed private parties to set pricing. The plaintiff has not established that the allocable share amendment constitutes hybrid restraint.

Plaintiff has not provided evidence that the allocable share amendment is *per se* violative of the Sherman Act or is an illegal hybrid restraint.[42] Therefore, plaintiff is not entitled to summary judgment that the allocable share amendment violated the Sherman Act.

Defendant has borne his burden of demonstrating that no question of material fact exists which would preclude summary judgment that plaintiff's Sherman Act claim has no merit. The defendant is entitled to summary judgment, dismissing plaintiff's Sherman Act claim.

### 3. First Amendment and 14th Amendment Equal Protection Claims: Counts I and II[43]

Plaintiff's equal protection claim is that its fundamental rights under the First Amendment have been violated by the allocable share amendment; that as a result the amendment should be subjected to strict scrutiny under an equal protection analysis; and that the amendment does not pass a strict scrutiny examination. Plaintiff acknowledges that the amendment does not directly or affirmatively limit First Amendment rights, but argues that the amendment "needlessly encourages" the waiver of free speech.[44] Alternatively, plaintiff argues that the amendment is not rationally related to a legitimate State interest.

The Equal Protection Clause of the Fourteenth Amendment essentially requires that all

---

[42]Because plaintiff has not provided evidence of a violation of the Sherman Act, it is not necessary for this court to determine whether the allocable share amendment escapes preemption under *Parker v. Brown*.

[43]Each of Counts I, II and III allege violations of the United States Constitution and the Louisiana Constitution. See section 5, which addresses the state constitutional claims.

[44]Plaintiff relies upon *U.S. v. Jackson*, 390 U.S. 570, 581-82 (1968)("the evil in the ... statute is not that it necessarily coerces [a waiver of constitutional rights] but simply that it needlessly encourages" such a waiver).

persons similarly situated be treated alike.[45]    To establish an equal protection claim, a plaintiff must prove: 1) that defendant created two or more classifications of similarly situated plaintiffs that were treated differently, and 2) that the classification had no rational relation to any legitimate government objective.[46]  State statutes are presumptively constitutional.[47]

Strict scrutiny is required of government action which implicates a fundamental right or discriminates against a suspect class.[48]  Rights under the First Amendment are fundamental.[49] Statutes which affect fundamental rights pass constitutional muster only if it addresses a compelling governmental interest and is narrowly tailored to achieve that goal.[50]

By contrast, if the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, or implicate a fundamental right, then the government action, even if irrational, does not violate the Equal Protection Clause.[51]  Statutes dealing with economic issues must pass only a rational basis test to survive constitutional scrutiny:

> In areas of social and economic policy, a statutory
> classification that neither proceeds along suspect lines

---

[45]*Stefanoff v. Hay Co., Tex.*, 154 F.3d 523, 525-26 (5th Cir. 1998).

[46]*Stefanoff*, 154 F.3d at 526.

[47]*Lemon v. Kurtzman*, 411 U.S. 192 (1973)(*citing San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973)).

[48]*Sonnier v. Quarterman*, 476 F.3d 349, 368 (5th Cir. 2007)(*citing Plyer v. Doe*, 457 U.S. 202, 217-18 (1982)).

[49]*Chiu v. Plano Independent School Dist.*, 339 F.3d 273, 280 (5th Cir. 2003)(*citing Schenck v. Pro-Choice Network*, 519 U.S. 357, 377 (1997)).

[50]*Longoria v. Dretke,* 507 F.3d 898, 902 (5th Cir. 2007)(*citing Sherbert v. Verner*, 374 U.S. 398 (1963)).

[51]*Vera v. Tue,* 73 F.3d 604, 610 (5th Cir. 1996)(*citing Brennan v. Stewart*, 834 F.2d 1248, 1257 (5th Cir. 1988)); *Stefanoff*, 154 F.3d at 525.

> nor infringes fundamental constitutional rights must
> be upheld against equal protection challenge if there
> is any reasonably conceivable state of facts that could
> provide a rational basis for the classification.[52]

The Supreme Court noted:

> In the area of economics and social welfare, a State
> does not violate the Equal Protection Clause merely
> because the classification made by its laws are
> imperfect. If the classification has some reasonable
> basis, it does not offend the Constitution simply
> because the classification is not made with
> mathematical nicety or because in practice it results
> in some inequality. The problems of government are
> practical ones and may justify, if they do not require,
> rough accommodations - illogical, it may be, and
> unscientific.[53]

The Louisiana Legislature has explicitly declared that "[c]igarette smoking presents serious

health concerns to the state and to the citizens of this state," and that "[c]igarette smoking also

present serious financial concerns for the state ... [because] the state may have a legal obligation to

provide medical assistance to eligible persons for health conditions associated with cigarette

smoking."[54] Further, the Legislature stated that "[i]t is the policy of this state that financial burdens

imposed on the state by cigarette smoking be borne by tobacco product manufacturers rather than

by the state ..."[55] The statute specifically provides:

> It would be contrary to the policy of this state if

---

[52]*Federal Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993).

[53]*U.S.R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 175 (1980)(citations omitted).

[54]La. Rev. Stat. §13:5061(1) and (3).

[55]La. Rev. Stat. §13:5061(4).

> tobacco product manufacturers who determine not to enter into such a settlement could use a resulting cost advantage to derive large, short-term profits in the years before liability may arise without ensuring that the state will have an eventual source of recovery from them if they are proven to have acted culpably. It is thus in the interest of the state to require that such manufacturers establish a reserve fund to guarantee a source of compensation and to prevent such manufacturers from deriving large, short-term profits and then becoming judgment-proof before liability arises.[56]

Plaintiff argues that the Master Settlement Agreement, which plaintiff does not challenge, requires its participants to abandon certain rights of speech and association by prohibiting opposition to legislative proposals, by banning lobbying efforts to diminish settling states' rights under the Master Settlement Agreement, and by limiting involvement in tobacco-related trade associations and advertising. While plaintiff is not a signatory to the Master Settlement Agreement and thus not subject to the speech and association limitations imposed by the Master Settlement Agreement, plaintiff argues that both the allocable share amendment and its predecessor impose unfair escrow costs on it because it maintained its free speech and association rights by not signing the Master Settlement Agreement.

The evidence presented by plaintiff does not establish that its fundamental rights under the First Amendment have been implicated. Plaintiff has provided no evidence that it is being coerced to join the Master Settlement Agreement, nor does plaintiff argue that it is being coerced to do so. The allocable share amendment imposes costs upon the non-participating manufacturer based on

---

[56]La. Rev. Stat. §13:5061(6).

a neutral, per-cigarette calculation. According to Professor Gruber, plaintiff must make escrow payments of approximately $.025 for each cigarette that it sells in Louisiana, which plaintiff would also have had to make if it joined the Master Settlement Agreement as a non-exempt subsequent participating manufacturer. Non-participating manufacturers, such as plaintiff, are no worse off financially than the original participating manufacturers and subsequent participating manufacturers, and arguably may be better off because they retain their First Amendment protections pertaining to advertising, lobbying and seeking government redress,[57] which the original participating manufacturers and subsequent participating manufacturers have surrendered.

Plaintiff contends that it should not be compared to the non-exempt subsequent participating manufacturers, but rather to the exempt subsequent participating manufacturers which joined the Master Settlement Agreement within ninety days of its execution in 1998. However, plaintiff is not challenging the Master Settlement Agreement, or the fact that the Master Settlement Agreement allowed for exempt subsequent participating manufacturers, or the fact that the allocable share amendment does not affect this arrangement. Plaintiff's argument that it should be compared to non-exempt subsequent participating manufacturers is not germane to whether plaintiff's First Amendment rights are implicated by the allocable share amendment's classification of participating manufacturers and non-participating manufacturers.

Plaintiff further argues that the allocable share amendment conditions plaintiff's receipt of a government benefit on its waiver of First Amendment rights; that is, as a result of enacting the

---

[57] *See KT&G Corp.*, 535 F.3d at 1135 (Tenth Circuit found similarly with regard to plaintiff's First Amendment challenge to the allocable share amendment s in Kansas and Oklahoma).

allocable share amendment, the State of Louisiana is withholding a government "benefit" until

plaintiff joins the Master Settlement Agreement and relinquishes their First Amendment rights.  It

is true that the government "may not deny a benefit to a person on the basis that infringes his

constitutionally protected interests  -  especially his interest in freedom of speech," even if the

person has no entitlement to the benefit.[58]  However, plaintiff has not identified the government

benefit that  the allocable share amendment denies them.  Plaintiff's evidence points to a loss of a

competitive advantage under the originally enacted escrow statute, but that evidence is insufficient

to show an implication of plaintiff's First Amendment rights.[59]  As the Tenth Circuit noted in

addressing this identical argument:

> Even if Plaintiff agreed now to join the Master
> Settlement Agreement and relinquish their First
> Amendment rights, they would not gain the "benefit"
> they seek - the competitive advantage they enjoyed
> under the originally enacted escrow statute.  That
> competitive advantage is now gone, regardless of
> what Plaintiffs choose to do. Therefore, Plaintiffs'
> claim - that Kansas and Oklahoma, as a result of
> enacting the [allocable share amendment], are
> withholding a government "benefit" until Plaintiffs
> join the Master Settlement Agreement and relinquish
> their First Amendment rights - fails.[60]

Plaintiff has not provided evidence that its First Amendment rights are implicated by the

imposition of the allocable share amendment and thus the amendment is not subject to strict

---

[58]*Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

[59]Other courts have also found that a competitive advantage is not a government benefit.  *See KT&G Corp.*, 535 F.3d at 1136; *Int'l Tobacco Partners*, 420 F.Supp. 2d at 998; *Grand River Enters. Six Nations, Ltd.*, 418 F.Supp.2d at 1093; *Dos Santos*, 418 F.Supp.2d at 1075.

[60]*KT&G Corp.*, 535 F.3d at 1135. (emphasis added)

scrutiny.

Plaintiff further contends that no rational basis exists for the unequal cost impositions caused by the allocable share amendment and that tobacco-related health care costs that are borne by the State of Louisiana are actually lessened by the shorter life spans of smokers.

Under rational-basis review, "[t]he government violates the Equal Protection Clause when it treats someone differently than another who is similarly situated without a rational basis for the disparate treatment."[61] "As to the rational relationship between the classification and purpose, we require only that the legislative body ... could rationally have decided that its classification might foster its purpose."[62] "In most cases, the classification and purpose are rationally related. But the State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."[63]

The stated purpose of the allocable share amendment is to insure that the state will have an eventual source of recovery from the non-participating manufacturers if they are proved to have acted culpably. It is thus in the legitimate interest of the State to require that such manufacturers establish a reserve fund to guarantee a source of compensation and to prevent such manufacturers

---

[61] *KT&G Corp.*, 535 F.3d at 1137-38 (*quoting Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 484 F.3d 1025, 1031 (10th Cir. 2007)).

[62] *KT&G Corp*, 535 F.3d at 1138 (*quoting Christian Heritage*, 483 F.3d at 1033). Emphasis added.

[63] *Id.* In *United States v. Carolene Products Co.,* 304 U.S. 144, 154 (1938), the Supreme Court held, pursuant to rational basis review, that when legislative judgment is called into question on equal protection grounds and the issue is debatable, the decision of the legislature must be upheld if "any state of facts either known or which could reasonably be assumed affords support for it." Further, "because we never require a legislature to articulate its reasons for enacting a statue, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *FCC v. Beach Communications Inc.,* 508 U.S. 307, 315 (1993). "Those attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it.'" *Id., quoting Lehnhausen v. Lake Shore Auto Parts Oc.,* 410 U.S. 356, 364 (1973)).

from deriving large, short-term profits and then becoming judgment-proof before liability may arise. Insuring the availability of these funds serves the States' interest in promoting public health. Further, basing the amount of a non-participating manufacturer's escrow payment on the number of cigarettes the non-participating manufacturer sells in that State insures that there will be a sufficient reserve available should the State recover a judgment against the non-participating manufacturer that directly ties those escrow reserves to the amount of harm a non-participating manufacturer's cigarettes may do in this State.

Plaintiff alleges that the amendment treats it differently than the cigarette manufacturers who participated in the Master Settlement Agreement, and that this disparate treatment is not rationally related to those government interests. But the amendment requires that any cigarette manufacturer that does business in Louisiana either join the Master Settlement Agreement or make escrow payments pursuant to that statute. In that regard, the amendment treats all cigarette manufacturers equally.

Plaintiff argues that the amendment treats them differently from exempt subsequent participating manufacturers which do not have to make any annual payments under the Master Settlement Agreement, so long as they do not increase their market share beyond 1997 and 1998 levels. Addressing similar agreements, the Tenth Circuit quoted with approval the Fourth Circuit's treatment of these issues:

> Although it is true that the statute creates distinctions among tobacco manufacturers based on whether a manufacturer signs the Master Settlement Agreement, the distinctions are rationally related to the legitimate purpose of ensuring a source of recovery from all manufacturers for future costs related to cigarette smoking.

For those manufacturers sued by [the states] for wrongdoing, the Master Settlement Agreement mandates not only strict conduct restrictions but also nonrefundable payments in perpetuity. Manufacturers joining the agreement as Subsequent Participating Manufacturers - those manufacturers who were not sued for wrongdoing - while not required to make the same payments as the original participating manufacturers, nevertheless agree to be bound by conduct restrictions. In contrast, nonparticipating manufacturers are subject to no conduct restrictions, and their payments in escrow last for only 25 years. In addition, these manufacturers received interest on the funds while they are held in escrow, and the principal is fully refunded if the money is not needed to pay a judgment in a tobacco-related lawsuit. Thus, the refundability of the payments is directly related to the nonparticipating manufacturers' future liability for tobacco-related losses.

Thus, the distinctions between manufacturers signing the Master Settlement Agreement and manufacturers not signing are rationally related to their status *vel non* as defendants, their willingness to agree to conduct limitations, and [the states'] need to ensure a source of recovery for all future tobacco-smoking related healthcare costs. All manufacturers thus bear responsibility in differing manners and degrees for limiting the [states'] future liability for these costs. Those manufacturers who have not admitted to any wrongdoing and who do not wish to limit their future conduct retain the ability to manufacture and market their product in the manner they pursued before, but they essentially provide a surety bond against future liability for tobacco-smoking related healthcare costs.[64]

Plaintiff's evidence of the cost impositions and lessened health care costs do not refute the fact that the State has the authority under its police powers to protect the health and welfare of its citizens. The allocable share amendment is a statute which was enacted explicitly to effect social and economic policy, a legitimate state interest, and thus is subject to a rational basis analysis.

---

[64]*KT&G Corp.*, 535 F.3d at 1139-40 (*quoting Star Scientific, Inc. v. Beales,* 278 F.3d 339, 351-52 (4th Cir. 2002).; *see also Pryor*, 425 F.3d 158 (2nd Cir. 2005)(holding escrow statute did not deprive non-participating manufacturers of equal protection of the law because that statute is rationally related to legitimate state interests, including promoting health and recovering costs for tobacco-related illnesses).

Under a rational basis analysis, the allocable share amendment is presumptively constitutional and not subjected to mathematical exactitudes, so long as it is rationally related to a legitimate state interest.

Plaintiff's evidence does not warrant summary judgment in plaintiff's favor that the allocable share amendment violates plaintiff's First Amendment rights or its Fourteenth Amendment Equal Protection rights. Plaintiff has not provided evidence that the allocable share amendment created two or more classifications of similarly situated plaintiffs that were treated differently, or that the allocable share amendment's classification had no rational relation to any legitimate government objective.[65] Plaintiff's motion for summary judgment is denied with respect to the First Amendment and Fourteenth Amendment Equal Protection claims asserted in Counts I and II.

Further, defendant has borne its burden of demonstrating that no question of material fact exists which would preclude summary judgment in its favor. Defendant is entitled to summary judgment, dismissing plaintiff's First Amendment and Fourteenth Amendment Equal Protection claims, asserted in Counts I and II.

## 4. Procedural Due Process Claim: Count III.

To demonstrate a procedural due process violation, plaintiff must prove that (1) he was deprived of a life, liberty, or property interest, (2) without the process that was due.[66] "It is well-established law that once an action is characterized as legislative, procedural due process

---

[65]*Stefanoff*, 154 F.3d at 526.

[66]*Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 538 and n.3, 542 (1985).

requirements do not apply.[67]   The Fifth Circuit has noted:

> While an individual is entitled to notice and a hearing before state action deprives him of life, liberty, or property, no such right attends legislative enactments that affect a general class of persons.  When the legislature enacts a law, or a state agency adopts a regulation, that affects a general class of person, all of those persons have received procedural due process by the legislative process itself and they have no right to individual attention.  The challenges to such laws and regulations must be based on their substantive compatibility with constitutional guarantees.[68]

Plaintiff argues that the allocable share amendment deprives plaintiff and other non-participating manufacturers of its property for twenty-five years because of its potential liability should it be sued, and that the amendment does not provide for a hearing or other process to determine whether there is a reasonable possibility of a future, unrecoverable judgment against it.

Plaintiff is challenging the State's legislative actions, not adjudicative actions.  "Official action that is legislative in nature is not subject to the notice and hearing requirements of the Due Process Clause."[69]  Here, the escrow reserves are not specific to any particular litigation; rather, they are legislative preconditions for the privilege of engaging in future cigarette sales in the individual states.  The reserves are designed to ensure that funds are available should litigation subsequently begin and result in judgment against the manufacturers.  Thus, the accounts are substantially

---

[67] *Jackson Court Condominiums, Inc. v. City of New Orleans*, 874 F.2d 1070, 1074 (5th Cir. 1989).

[68] *U.S. v. LULAC*, 793 F.2d 636, 649 (5th Cir. 1986) (*citing Nolan v. Ramsey*, 597 F.2d 577, 580 (5th Cir. 1979) and J. Nowak, A. Rotunda, J. Young, Constitutional Law at 556 (2nd Ed. 1983)).

[69] *Grand River Enterprises Six Nations, Ltd.*, 425 F.3d at 174 (citation omitted); *KT&G*, 535 F.3d at 1141.  *See also Valley v. Rapides Parish School Bd.*, 118 F.3d at 1053 ("adjudicative decisions, or issues not of a legislative, policy or legal nature, should be free of bias or prejudice.").

different in kind from any individual prejudgment deprivation of property.

The allocable share amendment is not adjudicative in nature, and the challenged legislation thus is not subject to the notice and hearing requirements of the Due Process Clause. Plaintiff is not entitled to summary judgment that the allocable share amendment violates plaintiff's procedural due process claims as asserted in Count III.

Defendant has borne his burden of demonstrating that no question of material fact exists which would preclude summary judgment in its favor. The court grants summary judgment in favor of the defendant, dismissing the procedural due process claim asserted in Count III.

## 5. State Constitutional Claims

The Eleventh Amendment protects states from being sued in federal court without their consent. Unless abrogated by Congress or waived by the State, sovereign immunity extends not only to the States themselves, but also to State officers and agencies.[70] Absent waiver by the State, a federal court has no power to order a State officer exercising delegated authority to comply with duties imposed by state law.[71]

The State of Louisiana has not waived its sovereign immunity over the state constitutionally based claims asserted in Counts I, II, and III of plaintiff's complaint, nor has Congress abrogated it. Plaintiff does not address defendant's claim of sovereignty immunity, and has presented no evidence that the State has waived its sovereign immunity either through Congressional act or by the State itself. The State of Louisiana is entitled to summary judgment dismissing plaintiff's state

---

[70]*Richardson v. Southern Univ.,* 118 F.3d 450, 452 (5th Cir. 1997), *cert. denied*, 522 U.S. 1078 (1998).

[71]*Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89 (1984).

constitutional claims.[72]

## 6. Conclusion

The Motion for Summary Judgment by Xcaliber International Limited, LLC is **DENIED**.

The Motion for Summary Judgment by James D. "Buddy" Caldwell, in his capacity as Attorney

General of the State of Louisiana, is **GRANTED,** dismissing plaintiff's claims against him.

New Orleans, Louisiana, this __7th__ day of May, 2009.

_____
**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**

---

[72]The state raises Eleventh Amendment immunity for the first time in its motion for summary judgment.